NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No. NV-12-1572-DKiCo |
| | ) |
| WASHINGTON GROUP INTERNATIONAL, INC., ET AL., | ) Bk. No. 01-31627-GWZ |
| | ) |
| | ) Adv. Proc. No. 05-05022-GWZ |
| Debtor. | ) |
| | ) |
| WASHINGTON GROUP INTERNATIONAL, INC., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) **M E M O R A N D U M**[1] |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Appellee. | ) |

Argued and Submitted on July 19, 2013
at Las Vegas, Nevada

Filed - August 2, 2013

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Gregg W. Zive, Bankruptcy Judge, Presiding

Appearances:   Beth Heifetz of Jones Day argued for appellant Washington Group International, Inc.; Glenn Douglas Gillett of the U.S. Department of Justice argued for appellee The United States of America.

---

[1]   This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

1

Before: DUNN, KIRSCHER and COLLINS[2], Bankruptcy Judges.

This appeal involves the impact of confirmation of a chapter 11[3] bankruptcy plan on claims that were not asserted in the bankruptcy case but are alleged by the debtor to have been within the "fair contemplation" of the claimant such that the claimant is enjoined from asserting the claims in subsequent litigation filed in federal district court. The bankruptcy court applied Ninth Circuit precedent, particularly as set forth in Cal. Dep't of Health Svcs. v. Jensen (In re Jensen), 995 F.2d 925 (9th Cir. 1993), and denied the debtor's motion to enjoin the subsequent litigation. We AFFIRM.

## I. FACTS

A. Context of the Current Dispute

On May 14, 2001 ("Petition Date"), Washington Group International, Inc. ("WGI") and most of its subsidiaries filed voluntary chapter 11 petitions. On December 21, 2001, the bankruptcy court confirmed WGI's Second Amended Plan, which provided that "[n]otwithstanding anything in the Plan or the Order of Confirmation to the contrary, the Plan does not discharge any cause of action that is not within the fair contemplation of the entity asserting the cause of action, in accordance with In re Jensen,

---

[2] Hon. Daniel P. Collins, Bankruptcy Judge for the District of Arizona, sitting by designation.

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

2

995 F.2d 925 (9th Cir. 1993)." The effective date of the confirmed plan was January 25, 2002 ("Effective Date").

On November 5, 2004, the United States of America, on behalf of the United States Agency for International Development ("USAID"), filed a complaint ("Complaint") in the United States District Court for the District of Idaho ("USAID Litigation"), asserting claims against WGI f/k/a Morrison Knudsen Corporation ("MK"), Contract International Inc. ("CII"), and Misr Sons Development S.A.E., a/k/a Hassom Allam Sons ("HAS") under the False Claims Act ("FCA")[4], the Foreign Assistance Act of 1961 ("FAA")[5], and several common law theories, including payment by mistake, unjust enrichment, and fraud. The Complaint alleged generally that the claims being asserted arose out of the

> fraud and misrepresentation of the defendants to secure five separate [USAID] funded host country construction contracts ["Egypt Contracts"] with the Arab Republic of Egypt ("Egypt") and the defendants' subsequent submission of false claims to USAID through false payment demands and other false records and statements intended to induce payment from USAID.

Complaint at 2:1-15.

On March 23, 2005, WGI commenced an adversary proceeding in the bankruptcy court seeking to enjoin continued prosecution of the USAID Litigation. The bankruptcy court determined through its order entered November 9, 2005, that USAID's common law claims were barred as a consequence of confirmation of the plan in WGI's bankruptcy

---

[4] 31 U.S.C. §§ 3729-33, as amended.

[5] 22 U.S.C. § 2399b, as amended.

3

case. On October 6, 2011, the bankruptcy court held a trial on the remaining issues of whether USAID's claims under the FCA and the FAA similarly were barred. The bankruptcy court's Memorandum Decision ("Memorandum") on those issues was entered April 24, 2012, and is the subject of this appeal.

B. Underlying Facts

1. The Contracts Generally

The Egypt Contacts were a result of the 1978 Camp David Accords, through which USAID committed more than $2 billion toward the development and rehabilitation of Egypt's infrastructure. To implement various infrastructure projects, the United States and various Egypt government agencies sought bids from qualified United States contractors. Although each contract was between a U.S. contractor and the Egyptian governmental agency responsible for the project, because some of the funding was from USAID, both the FAA and the FCA applied. The purpose of USAID's involvement was to ensure that USAID and "host country" (in this case Egypt) rules, requirements and procedures were followed and to ensure performance under the contract.

To bid on the prime contract for an individual project, a prospective bidder was required first to pre-qualify through USAID. USAID rules and regulations required that for any joint venture bidder, each joint venture member had to be pre-qualified. The primary purpose of pre-qualification was to ensure bidders could satisfy USAID's "nationality and source" rules.

USAID and the government of Egypt financed the infrastructure

4

projects and paid the prime contractors. USAID was charged with approving a contractor's request for payment ("Payment Request"). Each Payment Request was submitted to USAID's Contract Management Coordinator ("CMC"), and contained invoices which certified that the amounts requested were due and payable. The invoices also certified that "to the best of [the contractor's] information and belief any commodity or service supplied under said contract meets the source, origin, componentry and nationality requirements specified in the contract and/or letter of commitment" ("the Compliance Certification").

At issue in the USAID Litigation are five separate USAID-financed Egypt Contracts: the Ismailia Contract, the Port Said Contract, the Aswan Contract, the Luxor Contract, and the Telecom Contract. MK applied as the entity pre-qualifying for the Ismailia Contract, the Port Said Contract, and the Telecom Contract. A joint venture of MK and CII applied as the entity pre-qualifying for the Aswan Contract and the Luxor Contract.

2. The Canal Cities Contracts

MK submitted its pre-approval application for the design and construction of certain wastewater treatment facilities known as the Canal Cities Projects on March 17, 1989, and supplemented its application in June 1991 and again in September 1991. The Canal Cities Projects included the Ismailia Contract and the Port Said Contract. In September 1991, USAID's CMC for the Canal Cities Projects recommended MK as an approved bidder to the National Organization for Potable Water and Sanitary Drainage ("NOPWASD"),

5

the Egyptian government agency associated with the Canal Cities Projects.

On August 27, 1992, MK submitted a fixed price bid on the Ismailia Contract; the CMC recommended MK to NOPWASD, and NOPWASD awarded the Ismailia Contract to MK on October 26, 1992. Sometime thereafter, MK sought and received approval from USAID and NOPWASD for CII and HAS to perform work as subcontractors on the Ismailia Contract. Between 1993 and April 1995, MK submitted approximately 80 invoices for payment for work performed under the Ismailia Contract, each of which included the Compliance Certification. The Ismailia Contract was not executory at the time WGI filed its bankruptcy petition.

On September 30, 1993, MK submitted a fixed price bid on the Port Said Contract; the CMC recommended MK to NOPWASD, and NOPWASD awarded the Port Said Contract to MK on December 1, 1993. Sometime thereafter, MK sought and received approval from USAID and NOPWASD for CII and HAS to perform work as subcontractors on the Port Said Contract. Between 1993 and August 2000, MK submitted approximately 69 invoices for payment for work performed under the Port Said Contract, each of which included the Compliance Certification. The Port Said Contract was not executory at the time WGI filed its bankruptcy petition.

3. The Secondary Cities Contracts

MK formed a joint venture with CII ("MK/CII Joint Venture") on February 16, 1997. The MK/CII Joint Venture submitted its pre-approval application for what is referred to as the Secondary Cities

6

Projects, which called for the rehabilitation, augmentation, and extension of wastewater facilities in several Egyptian cities. The Secondary Cities Projects included the Aswan Contract and the Luxor Contract. USAID's CMC for the Secondary Cities Projects recommended MK and CII as approved joint venture bidders to the NOPWASD.

On May 6, 1998, the MK/CII Joint Venture ("Aswan Joint Venture") submitted a fixed price bid on the Aswan Contract; the CMC recommended the Aswan Joint Venture to NOPWASD, and NOPWASD awarded the Aswan Contract to the Aswan Joint Venture on October 1, 1998. Sometime thereafter, the Aswan Joint Venture sought and received approval for HAS to perform work as a subcontractor on the Aswan Contract.

Between 1998 and October 2003, the Aswan Joint Venture submitted approximately 55 invoices for payment for work performed under the Aswan Contract, each of which included the Compliance Certification. Nineteen of the invoices were submitted after confirmation of the WGI plan; eighteen of those were submitted after the Effective Date of the WGI plan.

On June 25, 2000, the MK/CII Joint Venture ("Luxor Joint Venture") submitted a fixed price bid on the Luxor Contract. The bid included a copy of a Luxor Joint Venture agreement dated June 13, 2000, which identified MK and CII as the parties to the Luxor Joint Venture. The CMC recommended the Luxor Joint Venture to NOPWASD, and NOPWASD awarded the Luxor Contract to the Luxor Joint Venture on April 24, 2001. In June 2001, the Luxor Joint Venture sought approval to use as a subcontractor on the Luxor Contract a

7

joint venture between CII and HAS.  After USAID rejected the request, the Luxor Joint Venture sought approval to use as a subcontractor on the Luxor Contract a joint venture between OCI (the parent of CII) and HAS, which USAID and NOPWASD approved.

Between 2001 and July 2004, the Luxor Joint Venture submitted approximately 38 invoices for payment for work performed under the Luxor Contract, each of which included the Compliance Certification. Thirty-three of the invoices were submitted after confirmation of the WGI plan; thirty-one of those invoices were submitted after the Effective Date of the WGI plan.

4.   The Telecom Contract

MK submitted its pre-approval application for the project to expand the telecommunications infrastructure in Egypt ("the Telecom Contract") on March 25, 1997.  USAID's CMC for the Telecom Project recommended MK as an approved bidder to Telecom Egypt, the Egyptian government agency responsible for projects to expand Egypt's telecommunications which were partially funded by USAID.

On February 14, 1999, MK submitted a fixed price bid, which listed HAS as a proposed subcontractor, on the Telecom Contract. The CMC recommend MK to Telecom Egypt, and Telecom Egypt awarded the Telecom Contract to MK on August 30, 1999.

Between 1999 and April 2003, MK submitted more than 300 invoices for payment for work performed under the Telecom Contract, each of which included the Compliance Certification.  One hundred thirty of the invoices were submitted after confirmation of the WGI plan; 121 of those were submitted after the Effective Date of the

8

WGI plan.

5. The Investigations

a. The Aswan Contract Investigation

Beginning in September 1999, MK notified the CMC, NOPWASD and USAID of problems in the Aswan Contract which resulted in cost overruns and time delays. Over the course of three years, several modifications to the Aswan Contract were negotiated between and among the CMC, NOPWASD, USAID and the Aswan Joint Venture, the result of which was additional compensation to the contractor and additional time to perform for the Aswan Joint Venture. In April 2001, WGI submitted Variation Order Request No. 50 ("VOR 50") for the Aswan Contract. VOR 50 was the precursor to WGI's formal "Request for Equitable Adjustment" claim ("REA Claim") submitted to an arbitration panel.

On March 13, 2002, a WGI employee produced in support of its REA Claim a document reflecting that the Aswan Joint Venture had requested and received cash calls from HAS in connection with the Aswan Contract, and that a three-party joint venture existed as to the Aswan Contract which included HAS. This document was turned over to USAID which then opened an investigation ("Aswan Investigation") into the existence of a three-party joint venture agreement related to the Aswan Contract. During the Aswan Investigation, WGI produced two signed joint venture agreements relating to the Aswan Contract, one which included HAS and one which did not.

Additional documents produced during the Aswan Investigation

9

revealed that undisclosed joint venture agreements existed with respect to other Egypt Contracts. WGI produced a three-party joint venture agreement relating to the performance of the Ismailia Contract; the parties to the agreement were MK, CII, and HAS. WGI produced a three-party joint venture agreement relating to the performance of the Port Said Contract; the parties to the agreement were MK, CII, and HAS. WGI produced an unsigned three-party joint venture agreement relating to the performance of the Luxor Contract; the parties to the unsigned agreement were WGI, CII, and HAS. Finally, WGI produced a two-party joint venture agreement relating to the performance of the Telecom Contract; the parties to the agreement were MK and HAS.

b. The Telecom Contract Investigation

Approximately sixteen months after MK was awarded the Telecom Contract, one of its suppliers, 3M, requested clarification from the CMC whether certain components to be supplied would comply with USAID regulations for the Telecom Contract. Shortly thereafter, in April 2001, a CMC agent visited WGI's warehouse to verify the source and origin of components awaiting use in the Telecom Contract at which time he observed packing cartons marked "Made in Spain" and "Made in Mexico." A USAID agent then interviewed the CMC agent regarding these observations. On June 27, 2001, a WGI employee called a CMC agent to inform him that WGI was ordering additional components from 3M that were not from the United States, and inquired whether those components would be compliant with USAID source and origin requirements. On July 14, 2001, another WGI

10

employee submitted a Telecom Contract invoice which included the Compliance Certification. On September 5, 2001, representatives of the CMC and of USAID inspected WGI's Telecom Contract warehouse in Heliopolis, Egypt, where they observed shipping boxes containing modular connectors and terminal blocks bearing Spain and Mexico manufacturing markings. The following week, a USAID agent visited WGI's offices to advise WGI of its civil investigation into WGI's use of components made in Mexico and Spain on the Telecom Contract. On November 18, 2001, WGI complied with USAID's request for source and origin information with respect to components supplied by 3M.

On October 9, 2001, Telecom Egypt recommended that the CMC withhold payment to WGI for non-USA product in light of questions regarding WGI's compliance with the source and origin requirements of the Telecom Contract. On October 10, 2001, the CMC notified WGI that it was withholding payment pending documentation of compliance with the source and origin requirements. The CMC sent WGI a letter report on October 31, 2001, outlining the apparent failure to comply with the source and origin requirements and advising that payments were being withheld for non-compliant components.

On November 7, 2001, a USAID agent subpoenaed WGI's records relating to the Telecom Conract. WGI complied with the subpoena on November 16, 2001. USAID's investigation of the source and origin issues with the Telecom Contract continued through 2002.

C.  The USAID Litigation and WGI's Bankruptcy Case

1.  Facts Relating to USAID's Notice of WGI's Bankruptcy

Three days after the Petition Date, WGI's Executive Vice

11

President sent a letter to USAID at its Washington, D.C. offices, to advise it of the bankruptcy filing, but emphasized that USAID's "contracts are with a non-filing subsidiary and therefore will not be affected by the filing." (Emphasis in original.) Six days after the Petition Date, a WGI vice president sent a letter to a USAID employee in Egypt to notify USAID of the bankruptcy filing, but emphasized that the "contract for the Luxor Project is with a non-filing joint venture and therefore will not be affected by the filing."[6] (Emphasis in original.)

On August 8, 2001, WGI filed amended schedules and an amended statement of financial affairs, modified in numerous places to include WGI's interests in joint ventures. The amended "Schedule G - Executory Contracts and Unexpired Leases" alone consisted of 531 pages. Additionally, some, but not all, of the monthly operating reports between the months ending June 2001 through November 2001 included a "Schedule of Investment and Receivables in

---

[6] There is an inconsistency in the record with respect to the date the Luxor Contract was awarded. "NOPWASD, with USAID's approval, on or about April 24, 2001, awarded and entered into the Luxor Contract with the Luxor MK/CII JV." Memorandum at 11:3-4. However, the USAID employee in Egypt testified that at the time he received word of WGI's bankruptcy, WGI and CII were the low bidder on the Luxor Contract, that the letter he received prompted USAID to check out the financial soundness of the joint venture, that WGI provided additional information to assure USAID and NOPWASD that WGI had the financial soundness and capacity to perform the Luxor Contract, and that WGI "thereafter" was awarded the Luxor Contract. Memorandum at 16:1-7; see generally Memorandum at 16:8-25 (identifying May 20, 2011, as the proposed signing date for the Luxor Contract).

12

Joint Ventures."

2. <u>USAID's Common Law Claims</u>

On November 9, 2005, the bankruptcy court granted summary judgment in the adversary proceeding in favor of WGI barring USAID from asserting all claims in the USAID Litigation. In doing so, the bankruptcy court relied upon the following facts.

During the course of WGI's bankruptcy case, WGI filed motions to assume all of the Egypt Contracts. After hearing, the motions were granted. The United States never raised an issue of default with respect to the Egypt Contracts, and did not request any cure prior to assumption. Orders were entered approving the assumptions of the Egypt Contracts on July 6, 2001 and August 1, 2001. In addition, the bankruptcy court established September 17, 2001, as the deadline for the United States to file proofs of claim asserting the need to cure the Egypt Contracts. The United States filed no cure claims by the deadline or at any time thereafter. The bankruptcy court noted that USAID waited more than three years after the cure claims deadline to raise its claims in the USAID Litigation, which it did without first obtaining the permission of or even notifying the bankruptcy court. The bankruptcy court also noted that it had approved a settlement between WGI and the United States of America with respect to all "indirect rate adjustment claims." WGI's motion to approve the settlement stated that the agreement between the parties "resolv[ed] all claims, including future claims, with the United States of America due to the formal closing of certain contracts that existed between WGI and the

13

federal government" and that "[t]he debtors believe that the Agreement resolves all claims between WGI and the federal government with respect to the Contracts and is fair and equitable and in the best interests of the estates." Based on the foregoing chronology, and upon USAID's failure to object to WGI's characterization that all claims were resolved by the settlement agreement, the bankruptcy court determined that USAID was barred from pursuing all of its alleged claims in the USAID Litigation.

USAID appealed to the District Court for the District of Nevada, which reversed to the extent the bar applied to USAID's claims under the FCA and the FAA, on the basis that the bankruptcy court had erred in deeming those claims to be cure claims under the Egypt Contracts rather than statutory claims. The District Court did not disturb the bankruptcy court's determination that USAID's alleged common law claims were barred.

3. USAID's Alleged Statutory Claims

On remand, and following further pretrial proceedings, the bankruptcy court held that as the party seeking relief, WGI bore the burden of proving that prosecution of the USAID Litigation was barred by the confirmation order as claims that were within the fair contemplation of USAID at the time of confirmation. The bankruptcy court then applied the "fair contemplation" test set forth in Jensen to USAID's statutory claims as to each of the Egypt Contracts.

With respect to the statutory claims relating to the Ismailia Contract and the Port Said Contract, the bankruptcy court held that because USAID did not learn of the alleged illegal joint venture

14

agreements among WGI, CII and HAS until after the Effective Date, USAID could not have fairly contemplated its alleged statutory claims against WGI. In addition, to the extent WGI made disclosures in its bankruptcy filings which identified its joint venture partners with respect to the Ismailia Contract and the Port Said Contract, the bankruptcy court determined that those disclosures were too vague to have alerted USAID to the illegal joint venture agreements. Finally, the letter assurances WGI sent USAID to the effect that the Egypt Contracts were with a non-filing subsidiary and therefore not affected by the bankruptcy filing negated any fair contemplation by USAID.

With respect to the statutory claims relating to the Aswan Contract, the bankruptcy court held that the analysis was similar as to that for the Canal Cities Contracts, except with respect to WGI's REA Claim. However, no evidence was provided to indicate that any information USAID obtained from the dispute regarding the REA Claim would raise USAID's suspicions as to alleged statutory claims. To the contrary, USAID and WGI had a 20-year history, including the Egypt Contracts and others, which the bankruptcy court characterized as "long and mutually beneficial." Further, WGI's cooperation in prior investigations would not have given USAID any specific reason to suspect WGI might have violated the FCA or the FAA. Thus, any pre-Effective Date statutory claims could not have been fairly contemplated by USAID. Additionally, the bankruptcy court reasoned that under O'Loghlin v. County of Orange, 229 F.3d 871 (9th Cir. 2000), any post-Effective Date statutory claims USAID had based on

15

continuing violations of the FCA or the FAA were not barred, because to hold otherwise would effectively provide WGI with a continuing license to violate the law.

With respect to the statutory claims relating to the Luxor Contract, the bankruptcy court held that any pre-Effective Date claims were not fairly contemplated because the alleged illegal joint venture agreement was not produced by WGI until after the Effective Date. Any statutory claims USAID may have had based on post-Effective Date violations of the FCA or the FAA were not barred, because to hold otherwise would effectively provide WGI with a continuing license to violate the law.

With respect to USAID's statutory claims relating to the Telecom Contract, the bankruptcy court held that pre-Effective Date claims related to use of alleged foreign-made components could have been fairly contemplated by USAID, and therefore discharged through WGI's plan, because USAID had begun to investigate WGI's compliance with component source and origin requirements on September 5, 2001, and withheld payment pending its investigation by November 2001. However, under the O'Loghlin analysis, the bankruptcy court ruled that any post-Effective Date claims related to use of alleged foreign-made components were not fairly contemplated by USAID, because to hold otherwise would effectively provide WGI with a continuing license to violate the law. Finally, any statutory claims based upon alleged false certifications and/or the existence of an illegal joint venture agreement, were not barred. As with the other Egypt Contracts, any pre-Effective Date claims were not fairly

16

contemplated because the alleged illegal joint venture agreement was not produced by WGI until after the Effective Date, and statutory claims USAID may have had based on post-Effective Date violations of the FCA or the FAA were not barred, because to hold otherwise would effectively provide WGI with a continuing license to violate the law.

The bankruptcy court entered its order denying WGI's motion to enjoin the USAID Litigation on May 29, 2012. The bankruptcy court entered its order denying WGI's motion to alter or amend the Memorandum Decision on October 30, 2012. WGI filed a timely notice of appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B), (I), and (O). We have jurisdiction under 28 U.S.C. § 158(a).

## III. ISSUES[7]

Whether the bankruptcy court erred when it placed the burden of proof on WGI to establish that the USAID Litigation was barred by the confirmed chapter 11 plan.

Whether the bankruptcy court erred in its application of the "fair contemplation" test to determine whether the Statutory Claims were barred.

_____

[7] As stated in footnote 1 of Appellee's Opening Brief, WGI failed to comply with Rule 8010(a)(1)(B) &(C) by failing to include in its opening brief (1) a statement of appellate jurisdiction, (2) the standard of appellate review, (3) and the issues presented on appeal.

17

Whether the bankruptcy court erred when it determined that all post-Effective Date Statutory Claims were not barred.

### IV.   STANDARDS OF REVIEW

We review the bankruptcy court's allocation of the burden of proof, which is a conclusion of law, de novo.  See Ferrari, Alvarez, Olsen & Ottoboni v. Home Ins. Co., 940 F.2d 550, 555 (9th Cir. 1991).  De novo review requires that we consider a matter afresh, as if no decision had been rendered previously.  United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988); B-Real, LLC v. Chaussee (In re Chaussee), 399 B.R. 225, 229 (9th Cir. BAP 2008).

Where "the historical facts are established; the rule of law is undisputed, ...; and the issue is whether the facts satisfy the legal rule [,]" a mixed question of fact and law is presented which we review de novo.  Murray v. Bammer (In re Bammer), 131 F.3d 788, 792 (9th Cir. 1997).  Whether the bankruptcy court correctly applied Jensen's "fair contemplation" test is a mixed question of fact and law, as is the bankruptcy court's determination that USAID's post-Effective Date statutory claims are not barred.

### V.   DISCUSSION

A.   WGI Bore the Burden of Proof to Establish the Scope of the Bar to USAID's Claims.

Generally speaking, the party seeking relief bears the burden of proof.

> In order to invoke the jurisdiction of the federal courts, a plaintiff must establish "the irreducible constitutional minimum of standing," consisting of three elements: injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury.

18

[*Lujan v. Defenders of Wildlife*, 504 U.S. 55, 560–61 (1992)]; see *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093 (9th Cir.2003). The injury in fact must constitute "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." [*Lujan*, 504 U.S. at 560](internal citations and quotations omitted).

*Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).

In its adversary complaint, WGI invoked the jurisdiction of the bankruptcy court to determine whether the USAID Litigation violated the discharge provided by the confirmed plan. Paragraph J.1.(d) of the order confirming the chapter 11 plan provides an exception to discharge of certain claims:

Notwithstanding anything in the Plan or the Order of Confirmation to the contrary, the Plan does not discharge any cause of action that is not within the fair contemplation of the entity asserting the cause of action, in accordance with *In re Jensen*, 995 F.2d 925 (9th Cir. 1993).

Whether the USAID Litigation constituted "an invasion of a legally protected interest," i.e., WGI's discharge of claims through the confirmed plan, required a determination that the FCA and FAA claims were within the fair contemplation of USAID. The bankruptcy court properly placed the burden of proof on WGI.

B.    The Bankruptcy Court Correctly Analyzed the Status of USAID's Statutory Claims.

"We look to federal law to determine when a claim arises under the bankruptcy code." *Zilog, Inc. v. Corning (In re Zilog, Inc.)*, 450 F.3d 996, 1000 (9th Cir. 2006). The Bankruptcy Code defines the term "claim" broadly:

19

> The term "claim" means –
> (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, secured, or unsecured.

Section 101(5).

However, the broad definition of claim is not without limit. In this appeal we are asked to determine whether two specific limits on the definition of claim apply to the USAID Litigation. The first is known as the "fair contemplation" test, as set forth in Jensen, and specifically incorporated into WGI's confirmation order. The second limit, identified in O'Loghlin, can render postpetition acts in violation of a statute into a postpetition claim, notwithstanding that the debtor had been violating the statute prepetition.

As noted by the bankruptcy court:

> Jensen's "fair contemplation" test is a totality of the circumstances test, whereby the court should consider: (1) when the conduct underlying the creditor's claim occurred; (2) the creditor's knowledge of that conduct; (3) whether the creditor had an opportunity to learn of the conduct underlying the claim and whether it undertook an investigation to determine whether it had a claim; and (4) whether there was any prepetition relationship between the parties.

Memorandum Decision at 46:3-10.

The bankruptcy court determined that with respect to USAID's alleged claims premised upon the FCA and FAA based on WGI's alleged illegal joint ventures, those claims could not have been in USAID's fair contemplation prior to the Effective Date because USAID first

20

learned of the illegal joint ventures during the Aswan Investigation, which commenced after the Effective Date. The record supports this determination. Although WGI amended its schedules and statement of financial affairs prior to the Effective Date to make reference to some or all of the illegal joint ventures, there is nothing in the record to demonstrate that these disclosures were brought to USAID's attention. Had USAID been looking for them, it would have been like looking for the proverbial needle in a hay stack in light of the magnitude of the changes to the schedules. In any event, USAID would not have been on notice to look for them where WGI had affirmatively assured USAID that their contracts were not implicated in the filing. While the bankruptcy court's decision in November 2005 barring the common law claims referenced the assumption of the Egypt Contracts and a settlement with USAID of rate adjustment claims which took place prior to the Effective Date, WGI did not provide anything in the record with respect to these proceedings from which we might conclude USAID had some knowledge of the alleged illegal joint ventures. We therefore agree that (1) USAID's claims on the Ismailia Contract and the Port Said Contract, (2) USAID's pre-Effective Date claims on the Aswan Contract and the Luxor Contract, and (3) USAID's pre-Effective Date claims on the Telecom Contract, which are based on alleged illegal joint ventures, are not subject to WGI's discharge based on the application of the Jensen "fair contemplation" test.

Even after the Effective Date, WGI continued to submit invoices which bore allegedly false certifications. As a matter of policy,

21

it was appropriate to apply O'Loghlin to exclude these claims from WGI's discharge. To do otherwise, as repeatedly stated by the bankruptcy court, would be to provide WGI with a continuing license to violate the law. Accordingly, the bankruptcy court did not err when it determined that (1) USAID's post-Effective Date claims on the Aswan Contract and the Luxor Contract, and (2) USAID's post-Effective Date claims on the Telecom Contract, based upon alleged false certifications, were not subject to WGI's discharge.

Finally, the bankruptcy court determined that because USAID had commenced an investigation into its source and origin claims under the Telecom Contract prior to the Effective Date, those statutory claims were within USAID's "fair contemplation" such that USAID should have asserted them on or before the claims bar date in WGI's bankruptcy case. Because these claims were not timely asserted, they are discharged. USAID did not appeal this determination; nor, of course, did WGI. WGI does assert on appeal, however, that the bankruptcy court erred when it did not extend the discharge to post-Effective Date claims for the same alleged violations, rather than applying O'Loghlin. We cannot agree. Like the bankruptcy court, we believe that doing so would be tantamount to giving WGI a license to violate the FCA and FAA post-Effective Date.

## VI. CONCLUSION

As the party seeking relief through the adversary proceeding complaint, WGI bore the burden of proof to establish that the scope of the discharge encompassed the claims in the USAID Litigation. The bankruptcy court did not err when it determined that the only

22

alleged statutory claims of USAID which were discharged were the pre-Effective Date claims for violations of the source and origin requirements under the Telecom Contract.  We AFFIRM.